UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------X

ALMUT VON BIEDERMANN,

                                        Plaintiff,    **CV-10-1805 (ADS) (WDW)**

                   -against-

ECHO METRIX, INC., AS SUCCESSOR IN
INTEREST TO SEARCHHELP, INC. and
SEARCHHELP, INC.,

                                        Defendants.

--------------------------------------------------------X

**MEMORANDUM OF LAW
OF PLAINTIFF ALMUT VON BIEDERMANN
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Murphy & McKenna, LLC
445 Broadhollow Road, Suite 229
Melville, New York 11747
(516) 739-3395

## Table of Contents

|  | Page |
|---|---|
| Preliminary Statement | 1 |
| Timeline | 3 |
| Statement of Facts | 7 |
| Argument | 11 |
| I. Summary Judgment Standard | 11 |
| II. General Standard of Contractual Review Under New York Law | 11 |
| III. Defendant Breached the Consulting Agreement of March 20, 2009 | 12 |
| IV. Defendant Breached the Employment Agreement of March 23, 2009 | 13 |
| A. Effectiveness of the Employment Agreement | 13 |
| B. Plaintiff was Terminated Without Good Cause | 15 |
| C. Plaintiff was Terminated as a Result of or in Connection with a Change of Control | 19 |
| Conclusion | 20 |

# Table of Authorities

| | Page |
|---|---|
| **Statutes** | |
| Local Rule 56.1 | 7,8 |
| Federal Rule of Civil Procedure 56 | 11 |

## Cases

| | |
|---|---|
| *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) | 11 |
| *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118 (2d Cir. 1990) | 11 |
| *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) | 11 |
| *Friedman v. Schwartz*, 2010 WL 3937304 (E.D.N.Y. Sept. 30, 2010) | 11 |
| *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168 (2d Cir.2004) | 11 |
| *Crane Co. v. Coltec Indus., Inc.*, 171 F.3d 733 (2d Cir.1999) | 12 |
| *Am. Express Bank Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 562 N.Y.S.2d 613 (1st Dep't 1990) | 12 |
| *Tigue v. Commercial Life Ins. Co.*, 219 A.D.2d 820, 631 N.Y.S.2d 974 (4th Dep't 1995) | 12 |
| *Novick v. AXA Network, LLC*, 642 F.3d 304 (2nd Cir. 2011) | 12, 17 |
| *Lowell v. Twin Disc, Inc.*, 527 F.2d 767 (2d Cir.1975) | 12, 17 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ALMUT VON BIEDERMANN,

                                        Plaintiff,   **CV-10-1805 (ADS) (WDW)**

          -against-


ECHO METRIX, INC., AS SUCCESSOR IN
INTEREST TO SEARCHHELP, INC. and
SEARCHHELP, INC.,

                                        Defendants.
----------------------------------------------------------X

**MEMORANDUM OF LAW
OF PLAINTIFF ALMUT VON BIEDERMANN
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

          Plaintiff, Almut von Biedermann, by her attorneys, Murphy & McKenna, LLC,

respectfully submits this memorandum of law in support of her motion for summary judgment.

As set forth herein, the undisputed material facts of this case support holding that the defendant

breached both a Consulting Agreeement and an Employment Agreement with Ms. Biedermann

and therefore owes her monetary damages.

**Preliminary Statement**

          Prior to setting forth the facts, it is important to note that the issues in this case are very

simple, nothwithstanding the amount of paper involved with this motion.  There are two

contracts involved in the analysis.  Regarding the first in time, the Consulting Agreement of

March 20, 2009, the defendant appears to admit that the contract exists and was effective.  The

only issue appears to be payment of $20,000 claimed to be owed plaintiff under that contract.

          The second contract, an Employment Agreement, was entered into by the parties on

March 23, 2009.  The parties agree that it was entered into and that it was contingent on a certain

4

occurrence or occurrences in order for it to become effective. If the contract was never effective then plaintiff is owed nothing under it. If the contract was effective, there is no question that it was terminated by defendant as of November 15, 2009. The issue then is whether defendant had "Good Cause" under the contract for the termination. If so (recall that the contract is effective), plaintiff would be owed her salary under the contract from its effective date to the date of termination, and that is all, under the Employment Agreement.

If the defendant did not have "Good Cause" to terminate plaintiff then there are two possible outcomes. The first involves whether the termination was related to or as a result of a Change in Control of the defendant, as defined in the Employment Agreement. If the termination was related to a Change in Control then plaintiff is owed her salary through the termination date, plus a year's severance and benefits, as well as all options and warrants, specifically per the Employment Agreement. The second outcome arises if the termination is not a result of a Change in Control, in which case plaintiff is owed her salary through the termination date, one month's severance pay and options and warrants, once again specifically per the Employment Agreement.

A Timeline of the various relevant events immediately follows this section.

It is respectfully submitted that the issues presented herein are ripe for summary judgment because the undisputed and indisputable facts, as well as the law, support plaintiff's allegations.

## TIMELINE

**All Exhibit references are to those contained in the Murphy Affidavit in Support dated February 19, 2009**

| | |
|---|---|
| April 2007 – Early 2009 | William Bozsnyak, founder, CEO and Chairman of SearchHelp, corresponds and meets with plaintiff to discuss a potential executive employment opportunity for plaintiff at SearchHelp. See deposition transcript of plaintiff (Exhibit '4'), p.28, l.1 – p.56, l. 6. |
| July 2007 | Plaintiff applies for unsponsored 0-1 green card using attorney in Maryland. *Id at p. 39, l. 6 – p. 40, l. 1.* She told Bozsnyak that she might need his assistance if the 0-1 process was unsuccessful. *Id, at p. 40, l. 3-10.* |
| July 2008 | Plaintiff speaks with Bozsnyak about immigration status and the provision of a serious offer letter from SearchHelp for visa application purposes. *Id, at p. 64, l. 3-20* |
| September 2008 | Bozsnyak and plaintiff speak together about her ability to come to the United States and work at SearchHelp. Bosznyak ould be a solution found for any visa problem. *Id, at p. 48, l. 9 – p. 50, l. 10.* |
| October 2, 2008 | Plaintiff files Diversity Visa application. *Id, p. 75, l.5-25.* |
| January 2009 | Plaintiff's appeal denied regarding rejection of her 0-1 application. *Id, at p. 61, l. 6-12.* |
| February 10, 2009 | Bozsnyak resigns from SearchHelp but remains on the Board of Directors. See deposition transcript of Bozsnyak (Exhibit '22') p. 6, l. 3-10. |
| March 20, 2009 | Plaintiff and SearchHelp enter into Consulting Agreement, with Jeffrey Greene executing on behalf of the company as CEO. See Exhibit '5.' |
| March 21-23, 2009 | Greene calls plaintiff into his office in Syosset after the Consulting Agreement is signed and before the Employment Contract is signed, and specifically asks plaintiff about her visa situation. Plaintiff told Greene that she may need their help and he told her that would not be a problem. He stated specifically that he had previously gone through the process of sponsorship, using that particular word. They left the meeting with the understanding that the next steps would be taken |

|  | once funding was provided, if such steps needed to be taken. Exhibit '4,' p. 70, l. 3 – p. 72, l. 23; p. 75, l. 11 – p. 78, l. 9. |
|---|---|
| March 23, 2009 | Plaintiff and Searchhelp enter into Employment Agreement which becomes effective upon date Board approves of terms and conditions of funding, at which time she becomes Chief Operating Officer of SearchHelp. See Exhibit '8.' |
| March 20-July 18, 2009 | Plaintiff works as consultant. Receives business card indicating that she is COO. She is listed on the SearchHelp website, with a biography, as COO. See Exhibit '23.' |
| May 26, 2009 | SearchHelp changes its name to EchoMetrix, Inc. See Exhibit '9.' |
| June-July, 2009 | Discussions between Echo and Rock Island re investment. Term sheet prepared requiring super majority. See Bozsnyak transcript, See Exhibit '22,' p.55, l.24 - p. 56, l. 15. |
| July 29, 2009 | Echo approves, authorizes and executes Series B Convertible Term Stock Purchase Agreement with Rock Island Capital, LLC, wherein Echo would receive $5 million in three payments in exchange for 550,055 shares of B Convertible Shares, which according to Schedule 1 of the agreement (Exhibit '10') represented 59% of the total shares of the company. See Exhibit '10.' |
| August 1-3, 2009 | Plaintiff learns of the Rock Island funding and speaks with Greene by telephone, Greene giving her the specifics of the deal. See Exhibit '4,' p. 115, l. 9 – p.116, l. 3. |
| September 9, 2009 | A $2,000,000 initial tranche was received by Echo from Rock Island in exchange for 220,022 Series B shares, with two more payments to be received. See Exhibit '11,' p. F-24. |
| September 11, 2009 | Bozsnyak resigns from Echo Board of Directors, Exhibit "22," citing as one of the reasons that Rock Island wanted him removed from the Board because they wanted control over it and wanted their people in once they gained control over the company. He knew that they wanted control because they wanted super majority rights. He also heard it through other Board members, such as Jeff Greene and Erica Zalbert. See Bozsnyak deposition transcript, Exhibit '22,' p. 56, l. 22 – p. 7, l. 24. |
| September 16, 2009 | Greene emails plaintiff requesting information regarding her |

Visa status. See Exhibit '16.'

September 16, 2009    Echo formally announces the agreement with Rock Island
regarding the purchase of Series B Preferred Convertible
Stock at $9.09 per share. In the press release, Jay Safier, a
managing partner at Rock Island, stated that "We have
tremendous confidence in the management team led by Jeffrey
Greene, Chief Executive Officer, Peter Sealey, Chairman of
the Board and Erica Zalbert, Chief Financial Officer..." See
Exhibit '17.' Press release. *There is no mention of plaintiff
in the press release.*

September 17, 2009    Email from plaintiff to Greene that two events are immediately
due. She reminded Green that her employment contract was
triggered by the approval of the funding by the Board, not by
the funding itself. Then she asked for her warrants and stock
grant package. She also reminded Green that $20,000 owed
her under the Consulting Agreement had not been paid. In a
separate email she advises Greene of her current immigration
status. See Exhibit '18.'

September 23, 2009    David Lewis, a principal of Rock Island, is appointed to the
Echo Board of Directors. See Exhibit '20,' press release.

September 24, 2009    Plaintiff sends her bill to Echo for $20,000 for the accrued
amount owed under the Consulting Agreement. See Exhibit
'7.'

October 1, 2009    Peter Charles appointed Echo's VP and Director of Corporate
Affairs. See Exhibit '20.' Press release.

October 13, 2009    Telecon between plaintiff and "two new board members,
David Lewis and Rich Grossfeld. See Exhibit '19.'

October 15, 2009    Greene emails plaintiff that the Board has concern over her
ability to work permanently in New York and directed him to
terminate her for good cause unless she could cure her
visa/green card situation within 30 days as stipulated in her
contract section 4.1.1.c. See Exhibit '12.'

October 21, 2009    Plaintiff calls Greene and they talk. Plaintiff is told that the
$20,000 and all other compensation was frozen. Visa issue
discussed along with working to resolve the "cloud" that
would be "cleared up." See Exhibit '13.' Email.

November 5, 2009    Letter from plaintiff's counsel to Greene rejecting the

|  | termination, asking that it be withdrawn and requesting company sponsorship of H1B visa application. See Exhibit '14.' |
|---|---|
| November 5, 2009 | Peter Charles elected to the Board of Directors of Echo. See Exhibit '20.' Press release. |
| November 9, 2009 | Echo, through defense counsel/board member, responds to plaintiff's counsel's letter, rejecting any assistance, including sponsorship of plaintiff's application. See Exhibit '15.' |
| November 15, 2009 | Pursuant to EchoMetrix' letter of October 15,2009, plaintiff's termination becomes effective. |
| February 25, 2010 | Plaintiff's visa is granted through the process that she started on October 2, 2008, without any assistance from EchoMetrix. |

**Statement of Facts**

A statement pursuant to Local Rule 56.1 of undisputed material issues of fact was previously submitted to the Court, but was amended on February 19, 2009 solely to include citations that were not available as of its initial submission. The amended version is annexed to the affidavit of Robert S. Murphy dated February 19, 2009, as Exhibit '1.' It is incorporated herein by reference.

Plaintiff is a German citizen who has had green card status since February 25, 2010, though she had been working on obtaining that status for approximately 2 years prior to receiving it. Plaintiff had corresponded and met with William Bozsnyak, the founder, Chief Executive Officer and Chairman of SearchHelp, from approximately April of 2007 through early 2009, regarding a potential executive employment opportunity for plaintiff at SearchHelp. See deposition transcript of Plaintiff, p. 28, l. 16 – p. 56, l. 6, Exhibit '4' to the February 20, 2012 Affidavit of Robert S. Murphy, submitted in support of plaintiff's motion ("Murphy Aff.:" all exhibits referred to herein are to the Murphy Affidavit). Those discussions culminated in the parties entering into a one page consulting agreement with SearchHelp on March 20, 2009. The Consulting Agreement is annexed to the Murphy Affidavit as Exhibit '5' ('Consulting Agreement'). See Exhibit '1,' Plaintiff's Local Rule 56.1 Statement, para. 27.

The Consulting Agreement provided that plaintiff was to receive $10,000 per month for the services rendered by her to SearchHelp, for two months, with an extension contemplated. *Id* at para. 28. It also provided for the reimbursement to plaintiff of pre-approved expenses. See Exhibit '5.' $5,000 of the monthly amount was to be paid in cash and the other $5,000 was to be accrued for each month worked, and paid in a lump sum upon the implementation of her March 23, 2009 employment agreement, as well as funds being obtained by SearchHelp. See Exhibit

10

'1,' Plaintiff's Local Rule 56.1 Amended Statement, p. 29.

The Consulting Agreement was, in fact, extended for an additional two months. Plaintiff submitted to defendant four months worth of $5,000 invoices for services, covering the periods March 16, 2009 – April 16, 2009, April 16, 2009 – May 16, 2009, May 18, 2009 - June 18, 2009 and June 18, 2009 – July 18, 2009, all of which were paid by defendant. See Exhibit '6.'

On September 24, 2009, plaintiff billed defendant the $20,000 amount that had been accruing under the consulting agreement. See Exhibit '7.' To date the $20,000 has not been paid to plaintiff, constituting a breach of the Consulting Agreement and requiring judgment to be entered against defendant in plaintiff's favor for the breach, in the amount of $20,000, plus the legal rate of interest, from September 24, 2009 through the present.

Also as a result of various correspondence and meetings between April of 2007 and early 2009, the parties entered into an employment agreement, dated March 23, 2009. The Employment Agreement is annexed to the Murphy Affidavit as Exhibit '8.' Defendant has claimed that the Employment Agreement never became effective, but that is inaccurate, and in fact defendant explicitly relied on and cited to the provisions of the Employment Agreement when defendant gave plaintiff a thirty day notice of termination on October 15, 2009. The agreement became effective on July 29, 2009 and the termination was, at the very least, not for good cause and in bad faith. It also was pursuant to a Change in Control of the company. If the termination was not for good cause and was as a result of a Change in Control then pursuant to Section 4.3.2 plaintiff is entitled to 12 months salary, with all benefits, beyond the date of termination.

The Employment Agreement was a contingent contract. Pursuant to Section 2.1.4, it became effective if and when the Board of Directors of SearchHelp "approved" the terms and

conditions of funding. Once the Employment Agreement became effective, plaintiff was to

become the Chief Operating Officer and President of SearchHelp, at a $150,000 annual salary,

per Section 3.1, plus receive 1.5 million immediately vesting warrants to purchase SearchHelp's

common stock at $0.10 per share. Defendant believes the correct salary to be $125,000.

On or about May 26, 2009 SearchHelp changed its name to Echo Metrix, Inc. ('Echo')

See Exhibit '9,' Echo Form 8-K dated May 26, 2009.

On July 29, 2009 the Employment Contract became effective when Echo's Board of

Directors approved the terms and conditions of funding by entering into a Series B Convertible

Term Stock Purchase Agreement with Rock Island Capital, LLC ('Rock Island'), a copy of

which is annexed to the Murphy Affidavit as Exhibit '10.' As set forth in Exhibit 10, Sections

2.1, 2.2, 2.3, 2.4 and 2.8, on July 29, 2009, in exchange for a $5,000,000 investment, EchoMetrix

agreed to sell Rock Island 550,055 shares of B Convertible Preferred Shares, which would

provide Rock Island with 59.3% of the total shares of the company. See Schedule 1, last page of

Exhibit '10.'. $1,000,000 was to be paid on or before August 14, 2009, $1,000,000 on or before

October 7, 2009 and $3,000,000 on or before December 2, 2009. See para. 2.1 and 2.4. Two

addenda and two amendments to that contract changed the timing of payment but not the

substance of the transaction.

Article 3.3 of Exhibit 10 states that defendant warranted that it had the authority to enter

into the contract and in fact had authorized the transaction. Plaintiff's Employment Agreement

states at Section 2.1.4 that it would become effective when the board approved such funding.

Thus, on July 29, 2009, when Echo's board approved the funding by Rock Island, plaintiff's

Employment Agreement with defendant became effective, payment of her salary should have

commenced and the warrants due her pursuant to the contract should have issued. See

Employment Agreement, Exhibit 8 at Art. 3.3. Relevant excerpts of defendant's Form 10-K 2009 Annual Report dated March 30, 2010 are annexed to the Murphy Affidavit as Exhibit '11.' On page F-24, Note 14, there is a description of the transaction referred to above.

On October 15, 2009, plaintiff received the email notice annexed to the Murphy Affidavit as Exhibit '12,' indicating that the board of directors had concerns that she could not work permanently in New York, and that therefore, she had 30 days to cure her visa/green card situation or she would be terminated for good cause pursuant to Section 4.1.1.c of the Employment Agreement. Defendant's termination of plaintiff was based on Section 2.1.2 (Duties and Services) and Section 2.1.5 (Executive to perform the duties and services at Echo's headquarters in Syosset, New York). Defendant applied Section 4.1.1.c, essentially stating that because of her lack of a visa/green card, she was unable to perform the Services at the Syosset office, and had 30 days to get one.

On October 21, 2009, plaintiff emailed Jeffrey Greene after speaking with him on the telephone, a copy of which email is annexed to the Murphy Affidavit as Exhibit '13.'

On November 5, 2009, plaintiff, through counsel, emailed and overnight mailed a letter to CEO Jeffrey Greene requesting the cooperation of Echo in obtaining the proper immigration status of plaintiff by sponsorship of her application. See Exhibit 14.

On November 9, 2009, plaintiff's counsel received a response to Exhibit '14' from defendant's counsel, who was also a board member of Echo, which response is attached to the Murphy Affidavit as Exhibit '15.' In it, Echo refuses to sponsor plaintiff or assist her with her application, and denies any duty or obligation to do so.

The defendants were certainly aware that a Change of Control was occurring as well. See Exhibits '10' and '11.'Change of Control is defined in the Employment Agreement (Exhibit '8'

13

Section 1 (i)) as occurring when any person is or becomes the "beneficial owner" directly or indirectly, of securities of Echo representing 50% or more of the total voting power represented by Echo's then outstanding voting securities.  If plaintiff was terminated for other than good cause as a result of or in connection with a Change in Control, then she would be owed a year's salary, plus benefits, plus her 1.5 million warrants.  See Section 4.3.2.

**Argument**

## I. Summary Judgment Standard

Summary judgment should be granted where there is no genuine dispute as to any material fact and the moving party is entitled to summary judgment as a matter of law. See Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). The non-moving party cannot "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (internal citations and quotations omitted). There can be no "genuine issue as to any material fact" where the non-moving party fails to make a showing sufficient to establish the existence of an element "essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## II. General Standard of Contractual Review Under New York Law

To establish a cause of action for breach of contract, a plaintiff must establish by admissible evidence: (1) the existence of an agreement; (2) the plaintiff's adequate performance of that agreement; (3) a breach by the defendant; and (4) damages." *Friedman v. Schwartz*, 2010 WL 3937304, *2 (E.D.N.Y. Sept. 30, 2010) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004).

Under New York contract law, "the intent of the parties governs." *Crane Co. v. Coltec Indus., Inc.*, 171 F.3d 733, 737 (2d Cir.1999) (quoting *Am. Express Bank Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 562 N.Y.S.2d 613, 614 (1st Dep't 1990)). The intent of the parties is ascertained "from the plain meaning of the language employed' in the agreements, rather than from extrinsic evidence." *Crane*, 171 F.3d at 737 (quoting *Tigue v. Commercial Life Ins. Co.*, 219 A.D.2d 820, 631 N.Y.S.2d 974, 975 (4th Dep't 1995)). Where, as here, the parties' intent can be readily determined from the face of the agreement, interpretation of the agreement is a matter of law and the case is ripe for summary judgment." *Am. Express*, 562 N.Y.S.2d at 614. In this action, the agreements are plain on their face and ripe for interpretation by the Court and a subsequent order granting summary judgment.

> Furthermore, each contract contains an implicit understanding that neither party will intentionally do anything to prevent the other party from carrying out his part of the agreement. Persons invoking the aid of contracts are under implied obligation to exercise good faith not to frustrate the contracts into which they have entered. . . . It is likewise implied in every contract that there is a duty of cooperation on the part of both parties. Thus, whenever the cooperation of the promisee is necessary for the performance of the promise, there is a condition implied that the cooperation will be given.

*Novick v. AXA Network, LLC*, 642 F.3d 304, 312 (2nd Cir. 2011) (quoting *Lowell v. Twin Disc, Inc.*, 527 F.2d 767, 770 (2d Cir.1975).

These principles will control with regard to an analysis of the terms of these contracts, and the manner in which they have been utilized by defendant, both as a sword and a shield.

**III. Defendant Breached the Consulting Agreement of March 20, 2009**

The parties entered into the Consulting Agreement (Exhibit '5' to Murphy Affidavit), plaintiff performed pursuant to its terms, defendant paid part of the compensation owed for four months pursuant to the agreement ($20,000), pursuant to billings by plaintiff (Exhibit '6'), and

then failed to pay the final $20,000 owed on the contract after the final billing on September 24, 2009 (Exhibit '7'). There does not appear to be any reasonable factual dispute by defendant that the money is owed and therefore the non-payment of the accrued amount, $20,000, must be determined to be a breach of the agreement, as a matter of law, and judgment entered in plaintiff's favor for $20,000, plus interest at the legal rate from September 24, 2009 through the present.

## IV. Defendant Breached the Employment Agreement of March 23, 2009

Defendant breached the Employment Agreement by wrongfully terminating plaintiff, terminating her as a result of and/or in connection with a Change of Control of EchoMetrix, and then failed to pay her amounts due and owing under the Employment Agreement.

### A.    Effectiveness of the Employment Agreement

Defendant admits that the Employment Agreement was entered into by the parties on March 23, 2009 but claims that it never became effective and therefore EchoMetrix owes plaintiff nothing under the contract. Therefore, the first issue is whether the contract ever took effect.

Section 2.1.4 states:

> 2.1.4   The Company and the Executive hereby acknowledge that the employment is contingent upon the Company's Funding of Working Capital. ***The effective date is defined as the date which the Board of Director's (sic) has approved the terms and conditions of the Funding.***

Exhibit '8,' Emphasis added.

Thus there is clear, plain and unequivocal definition of the "effective date" of the contract. The question then turns to if and when the EchoMetrix Board of Directors approved the terms and conditions of funding. It is respectfully submitted that a review of the contract and

16

the facts prove that the Employment Agreement unequivocally took effect on July 29, 2009.

On July 29, 2009 EchoMetrix' Board of Directors approved the terms and conditions of funding by entering into a Series B Convertible Term Stock Purchase Agreement with Rock Island Capital, LLC ('Rock Island'), a copy of which is annexed to the Murphy Affidavit as Exhibit '10.' More specifically, as set forth in Exhibit 10, Sections 2.1, 2.2, 2.3, 2.4 and 2.8, on July 29, 2009, in exchange for a $5,000,000 investment, EchoMetrix agreed to sell Rock Island 550,055 shares of B Convertible Preferred Shares, which would provide Rock Island with 59.3% of the total shares of the company. See Schedule 1, last page of Exhibit '10.'. $1,000,000 was to be paid on or before August 14, 2009, $1,000,000 on or before October 7, 2009 and $3,000,000 on or before December 2, 2009. See Section. 2.1 and 2.4. Section 3.3 of Exhibit 10 states that defendant warranted that it had the authority to enter into the contract and in fact had authorized the transaction. Section 2.8 gave Rock Island super majority voting rights. Two addenda and two amendments to that contract changed the timing of payment but not the substance of the transaction.

As the contract language is clear that the Employment Agreement became effective on the day EchoMetrix' Board approved the funding, and did not require the receipt of funding, plaintiff became the Chief Operating Officer of EchoMetrix on July 29, 2009.

Another compelling reason why defendant cannot now be heard to claim that the Employment Agreement was never effective is that when plaintiff was given her 30 day notice of termination unless she obtained her visa/green card within that time, EchoMetrix used Section 4.1.1. (c) of the Employment Agreement to terminate her for alleged "Good Cause." See Exhibit '12." To now allow defendant to backtrack and claim that the Employment Agreement never became effective is to allow defendant to use a different part of the contract in an attempt to

shield it from liability while allowing defendant to decapitate plaintiff's action with the sword of a different section of the contract.

It is clear under the plain and unambiguous definition of the contract that the Employment Agreement was, in fact, effective as of July 29, 2009. Defendant cannot claim that it was never effective. As a result, pursuant to the terms, plaintiff is entitled to her $150,000 salary from July 29, 2009 forward, until November 15, 2009, the day her termination became effective. That amount is $43,750, plus interest.

### B. Plaintiff Was Terminated Without Good Cause

Since the contract was effective, we now turn to the issue of whether the termination of plaintiff was done pursuant to the 'Good Cause" provision of the Employment Agreement. This issue is particularly important to the defendant because if the termination falls outside of being for "Good Cause," then defendant owes plaintiff more than just the salary discussed in the preceding section. It would owe her, at a minimum, the $43, 750 past salary, plus one month's severance pay ($12,500), plus her 1.5 million warrants, See Exhibit '8,' Section 4.1.3. In addition, there was a Change of Control issue. See below. From an analysis of the contract and the facts, the termination was not for "Good Cause," but rather for some reason other than any visa/green card problems plaintiff had.

On October 15, 2009, plaintiff received the email notice, annexed to the Murphy Affidavit as Exhibit '12,' indicating that the board of directors had concerns that she could not work permanently in New York, and that therefore, she had 30 days to cure her visa/green card situation or she would be terminated for good cause pursuant to Section 4.1.1.c of the Employment Agreement. Section 4.1.1. provides that defendant has the right to terminate the contract for "Good Cause," which means:

(c)     The Executive's inability to perform the Services…unless such failure is not fully cured by the Executive within thirty (30) days of written notice…

If there was no "cure' then Section 4.1.2 allowed defendant to cease paying base salary immediately and clawback any stock options, warrants, etc. vested within the 180 days prior.

Defendant's termination of plaintiff is claimed to be based on a combination of Section 2.1.2 of the Employment Agreement, which very broadly and non specifically defines the "Duties" and "Services" for which plaintiff was being hired as those customarily required of a Chief Operating Officer of a same or similar company, as well as Section 2.1.5, which states, "Executive to perform such services and duties the Company's headquarters in Syosset, New York except when required to travel in the normal course of performing her duties." Defendant applied three sections of the contract, essentially concluding that because of her lack of a visa/green card, she was unable to perform the Services at the Syosset office, and had 30 days to get one.

First, plaintiff had fully performed and could still perform the duties and services while obtaining her green card. She had been diligently following the required governmental procedures to obtain her green card, on two fronts, one for two years, and defendant was well aware of that fact and her potential need for assistance from it, as well as that she was close to obtaining the visa/green card in the process. A review of the Timeline contained at pages 3-6 of this Memorandum is instructive on this issue, the citations to the record being included in each entry. The entries prior to June 2009 show the knowledge of defendant on the relevant issues, the statements of SearchHelp that it would provide her assistance in the form of sponsorship after the funding, if needed, and the attempts by plaintiff to obtain her visa/green card.

management and investors. The ruse is a violation of the implied obligation to exercise good faith not to frustrate the purpose of a contract, as well as violative of the implied duty of cooperation. Assuming that defendant is correct in its assertion that plaintiff promised to perform her work out of an office in Syosset, then the cooperation of Echometrix was necessary for the performance of that promise in the form of sponsorship of her H1B visa application, which was previously supported in March 2009 by Jeffrey Greene and once again requested on November 5, 2009. See Exhibit '14.' Given plaintiff's need for the assistance in order to fulfill the promise, there is a condition implied in the contract that the cooperation will be given. Exhibit '15,' defendant's complete rejection of any assistance whatsoever and a denial of any obligation to plaintiff, is violative of the cooperation requirement. *See Novick v. AXA Network, LLC*, 642 F.3d 304, 312 (2nd Cir. 2011) (quoting *Lowell v. Twin Disc, Inc.*, 527 F.2d 767, 770 (2d Cir.1975).

The Timeline is illustrative of the defendant's change in intentions. Plaintiff undertook her work as a consultant between March 20 and July 18, 2009, being provided with business cards listing her as the COO of SearchHelp and being listed on its website, with a biography, also listing her as COO. In the June – July, 2009 time frame, the discussions between EchoMetrix and Rock Island heated up, with a term sheet provided to EchoMetrix by Rock Island requiring a super majority for their investment. Approximately August 1-3, 2009, plaintiff learned of the approval of the stock purchase deal and called Greene to discuss it and what it meant. On September 9, 2009 the first $2,000,000 tranche was announced as received by EchoMetrix. On September 11, 2009, Bosznyak resigned from the Board of Directors because Rock Island wanted him removed because they wanted control over the board and wanted their people in.

On September 16, 2009, Greene emailed plaintiff asking for information on her visa status. Also on September 16, 2009, EchoMetrix issued a press release formally announcing the stock purchase. In that press release, Jay Safier, a managing partner at Rock Island, stated that "We have tremendous confidence in the management team led by Jeffrey Greene, Chief Executive Officer, Peter Sealey, Chairman of the Board and Erica Zalbert, Chief Financial Officer..."

It is noteworthy that there was no mention of plaintiff in that press release, Exhibit '17.'

On September 17, 2009, plaintiff wrote to Greene reminding him that her contract became effective upon approval of funding, and not by the funding itself. She also asked for her warrants and for payment of the $20,000 owed under the Consulting Agreement. On September 23, 2009, David Lewis, a principal of Rock Island, was appointed to the Board of Directors. On October 1, 2009, Peter Charles was appointed to the Board of Directors as a VP and Director of Corporate Affairs. On October 13, 2009, a telephone conference was held between plaintiff and "two new board members," David Lewis and Rich Grossfeld (Grossfeld also from Rock Island). Two days later, she received the 30 day notice of termination. This Court is referred to the remainder of the Timeline for support of discussions appearing above.

Defendant needed to terminate plaintiff for "Good Cause" because it was the least expensive way to shed an executive contract entered into before new management and investors took over. The new management of Rock Island did not want her there and did not want to pay her any money for past or future amounts owed, or provide her with the required warrants under the contract, so "Good Cause" was its only option. They were changing control of the company, and they did not want to pay for it (See discussion below).

They asked the founder of the company to resign from the Board because they wanted to

install their own people at EchoMetrix. They did in fact appoint their own people before sending out the termination notice to plaintiff. They installed their own people even during the termination process. They issued a press release, well before terminating plaintiff, that praised management, naming three of them but not the COO plaintiff. Still, if they had wanted to retain plaintiff as COO, all they had to do was cooperate with the request for visa application sponsorship, which they absolutely refused to do. The latter is a most direct way of telling plaintiff that EchoMetrix no longer wanted her as COO, or in any capacity.

It is respectfully submitted that the termination for "Good Cause" be determined to be invalid as a matter of law, since under these facts the law required defendant to act in good faith and cooperate to assist plaintiff by sponsoring her visa application. Echometrix first told plaintiff that she had breached the contract, then blocked her from curing the breach.

As the contract is effective and there is no "Good Cause" termination, then building on each section, plaintiff is owed her salary through termination ($43,750), plus one month's severance pay ($12,500) plus her 1.5 million warrants pursuant to Section 4.1.3 of the Employment Agreement. She is also owed interest on those amounts. However, plaintiff's termination was a Change of Control Termination under Section 4.3.2 of the contract, which provides her with more contractual benefits.

### C.      Plaintiff Was Terminated As a Result of or In Connection With a Change of Control

Change of Control is defined in the Employment Agreement (Exhibit '8' Section 1 (i)) as occurring when any person is or becomes the "beneficial owner" directly or indirectly, of securities of Echo representing 50% or more of the total voting power represented by Echo's then outstanding voting securities. Section 4.3.2. states that if an executive is terminated for other than good cause as a result of or in connection with a Change in Control, then she is owed

22

a year's salary from the date of termination, plus benefits, plus the 1.5 million warrants previously mentioned. Defendant needed plaintiff to be terminated for cause in order to not have to pay plaintiff upon termination.

That there was a Change in Control pursuant to the plain language definition in the Employment Agreement is absolutely clear. That plaintiff is a casualty as result of or in connection with a Change in Control at Echometrix is obvious from the facts. Rock Island's obtaining more than 50% of the voting stock (actually 59.3%) was plainly set out as a basis of the July 29, 2009 agreement between Echo and Rock Island (Exhibit '10' – Schedule 1, amongst other locations in the narrative, including Section 2.8) and that plan, per defendant's 2009 Form 10-K (Exhibit '11'), has been fully implemented.

Since the contract was effective, the termination was done without "Good Cause" and in fact was as a result of a Change in Control, plaintiff is owed back pay from July 29, 2009 through November 15, 2009 ($43,750), one year's severance pay ($150,000), any benefits for the one year period and 1.5 million warrants to purchase common stock at $0.10 per share. The total is $193,750, plus interest, plus benefits, plus her 1.5 million warrants.

## Conclusion

Defendant cannot escape the terms of its agreements and the consequences of its actions. Plaintiff's performance and defendant's actions in paying plaintiff ratifies the Consulting Agreement. Aside from the plain language and indisputable facts, defendant's reliance on the terms of Employment Agreement in terminating confirm that it was effective, that there was no Good Cause for terminating plaintiff, that the termination was as a result of a Change in Control. Defendant was bound to abide by contractual terms even when terminating plaintiff. For the compelling reasons set forth above, plaintiff Almut Von Biedermann, respectfully urges this

Court to grant her motion for summary judgment in all respects and for such other and further

relief as the Court finds just and proper.

DATED: Melville, New York
February 20, 2012

Respectfully submitted,

MURPHY & MCKENNA LLC

by ROBERT S. MURPHY (RM6909)
Attorneys for Plaintiff
445 Broadhollow Road, Suite 229
Melville, NY 11747
(516) 739-3395

TO:    Randy Zelin, Esq.
Moritt, Hock & Hamroff
400 Garden City Plaza
Garden City, NY 11530
(516) 873-2000