UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ALMUT VON BIEDERMANN,

       Plaintiff,

   -against-         **MEMORANDUM OF
                 DECISION AND ORDER**
                 10-CV-1805(ADS)(WDW)
ECHO METRIX, INC. AS SUCCESSOR IN
INTEREST TO SEARCHHELP, INC. and
SEARCHHELP, INC.,

       Defendants.
----------------------------------------------------------X
**APPEARANCES:**

**Murphy & McKenna, LLC**
*Attorneys for the plaintiff*
1461 Franklin Avenue, 2nd Floor
Garden City, NY 11530
  By: Robert S. Murphy, Esq., Of Counsel

**Moritt, Hock & Hamroff, LLP**
*Attorneys for the defendants*
400 Garden City Plaza, Suite 202
Garden City, NY 11530
  By: Randy Scott Zelin, Esq., Of Counsel

**SPATT, District Judge**.

  On April 22, 2010, Almut Von Biedermann ("Von Biedermann" or "the Plaintiff") commenced this action against Echo Metrix, Inc. ("Echo"), as successor in interest to SearchHelp, Inc., and SearchHelp, Inc. ("SearchHelp" and together with Echo, "the Defendants") seeking damages for alleged breaches of contract under New York law. Presently before the Court is the Plaintiff's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the motion is granted in part and denied in part.

## I. BACKGROUND

Unless otherwise indicated, the following constitutes the undisputed facts of the case derived from the parties' submissions, accompanying affidavits, and Local Rule 56.1 Statements.

## A. Factual Background

In April of 2007, plaintiff Almut Von Biedermann was introduced to William Bozsnyak, the founder, CEO, and Chairman of SearchHelp, Inc., a public company that was initially created to protect children online. At that time, Von Biedermann was a German citizen with German residency and could only travel to the United States on a business visa or for other limited purposes. Over the course of the next two years, while Von Biedermann attempted to obtain a green card, she continued to correspond with Bozsnyak about potential employment at SearchHelp.

The facts regarding Von Biedermann's attempt to obtain a visa and representations made by the parties to each other regarding Von Biedermann's immigration status are heavily disputed. However, it is undisputed that, between April of 2007 and March of 2009, the parties engaged in negotiations, resulting in a contingent agreement whereby SearchHelp would hire Von Biedermann as their new Chief Operating Officer ("COO") and President. Because any potential employment agreement would be contingent on the company obtaining funding, the parties entered into the following two agreements that are at issue in this litigation.

First, on March 20, 2009, the parties entered into a one page consulting agreement (the "Consulting Agreement"), pursuant to which the Plaintiff would provide SearchHelp with interim services over a two month period, which was subject to an extension. (See Murphy Aff., Ex. 5.) The Consulting Agreement was signed by Von Biedermann, and Jeffrey Greene, the CEO of SearchHelp. In addition to listing her interim responsibilities, the Consulting Agreement

also included: (1) a schedule outlining the amount of time Von Biedermann would spend in New York, and the amount of time she would spend working from Germany and (2) a compensation provision whereby SearchHelp would pay Von Biedermann $10,000 per month, $5,000 of which would be paid at the time she invoiced for the work and $5,000 "to be accrued paid upon employment contract implementation". The Consulting Agreement was extended for an additional two months, and the Plaintiff submitted to the Defendant invoices for: March 16, 2009–April 16, 2009; April 16–May 16, 2009; May 18–June 18, 2009; and June 18–July 18, 2009.

Second, on March 23, 2009, the parties entered into a contingent employment agreement whereby Von Biedermann would become the COO and President of SearchHelp, from the date the agreement became effective, until March 16, 2012 ("the Employment Agreement"). (See Murphy Aff., Ex. 8.) The Employment Agreement was a "contingent" agreement because, pursuant to Section 2.1.4, it became effective if, and when, the Board of Directors "approved" the terms and conditions of funding. Once the employment agreement became effective, the parties do not dispute that the Plaintiff would become the COO and President of SearchHelp, receive an annual salary—the amount of which is in dispute—and receive 1.5 million immediately vesting warrants to purchase SearchHelp's common stock at $.10 per share.

On May 26, 2009, SearchHelp changed its name to Echo Metrix, Inc. On July 29, 2009, Echo's board approved the terms and conditions of funding by entering into a Series B Convertible Term Stock Purchase Agreement with Rock Island Capital, LLC, which provided Rock Island with 59.3% of the total shares of the company ("the Purchase Agreement"). (See Murphy Aff., Ex. 10.) On August 13, 2009 and August 26, 2009, Echo and Rock Island entered into an addenda to the Purchase Agreement, involving changes to the timing of payment by Rock

3

Island to Echo. In addition, Echo and Rock Island entered into subsequent amendments to the Purchase Agreement, including one on September 4, 2009, that provided a change in the payment schedule. Following these agreements, a number of Rock Island employees were appointed to leadership positions at Echo and to the Echo Board of Directors. Von Biedermann contends that the Employment Agreement became effective on July 29, 2009, when Echo and Rock Island entered into the Purchase Agreement. However, the Defendants contend that the Employment Agreement never became effective.

Despite the fact that the Defendants take the position that the Employment Agreement had not become effective, on October 15, 2009, Greene sent an email to Von Biedermann advising her that:

> The Board of Directors have concern over your ability to work permanently in New York. They have directed me to initiate the termination for good cause unless you can cure your visa/green card situation within 30 days as stipulated in your contract in section 4.1.1 (c).

(Murphy Aff., Ex. 12.) Section 4.1.1(c) of the Employment Agreement states that the Defendants can terminate Von Biedermann for "good cause" is she is unable "to perform the Services" or is "incompeten[t] in adequately performing the Duties and Services, within reason, unless such failure to perform is not fully cured by the Executive within thirty (3) days of written notice therefore . . .". (Employment Agmt., § 4.1.1(c), pg. 11.)

The purported basis for terminating Von Biedermann's employment was that she had failed to secure a visa, and therefore could not fulfill the requirement in Section 2.1.5 of the Employment Agreement. Section 2 of the Employment Agreement related to Von Biedermann's duties and services as the COO and President of SearchHelp, and provided in section 2.1.5 that "Executive shall perform such services and duties at the Company's headquarters in Syosset,

New York except when required to travel in the normal course of performing her duties". (Employment Agmt., §2.1.5, pg. 2.)

Subsequent to receiving the October 15, 2009 email from Greene, Von Biedermann, on her own and then through counsel, attempted to get the Defendants to cooperate in sponsoring or otherwise assisting her visa application. The Defendants refused and terminated Von Biedermann's employment pursuant to the Employment Agreement on November 15, 2009.

## B. Procedural History

On April 22, 2010, the Plaintiff commenced this action against the Defendants asserting three causes of action for breaches of the Employment Agreement and the Consulting Agreement. The first and third causes of action allege that the Defendants breached the Employment Agreement. First, the Plaintiff alleges that the Defendants terminated her without "good cause" and in bad faith, and therefore, pursuant to section 4.1.3 of the Employment Agreement, she is entitled to monetary damages from the effective date of the Employment Agreement, July 29, 2009, through her termination on November 15, 2009, and one month's severance pay. The Plaintiff also asserts that the Defendants terminated her employment without good cause and as a result of a change in control of the company. Therefore, pursuant to section 4.3.2 of the Employment Agreement, she is entitled to twelve months salary, with all benefits, beyond the date of termination. Finally, the Plaintiff argues that, even assuming she was terminated for good cause, the Defendants have breached the Employment Agreement by failing to pay her for the period from July 29, 2009 through November 15, 2009.

The Plaintiff's second cause of action asserts that the Defendants breached the Consulting Agreement. There is no dispute that the Defendants paid the Plaintiff the initial monthly amounts due under the agreement for the four months of invoices she submitted for March

through July of 2009. There is also no dispute that, on September 24, 2009, the Plaintiff billed the Defendants for the $20,000 still owed under the Consulting Agreement, and that the Defendants have not paid this amount. Accordingly, the Plaintiff alleges that the Defendants have breached the Consulting Agreement, and owe her $20,000 plus the legal rate of interest from September 24, 2009 through the present.

On February 20, 2012, the Plaintiff moved for summary judgment on all three causes of action. However, in her reply, the Plaintiff essentially withdrew her summary judgment motion with respect to the causes of action that involve a finding as to whether or not her termination was for "good cause" or due to a "change in control", admitting that issues of fact existed on these issues. (Murphy Reply Aff., ¶ 3.) Thus, what remains pending before the Court is the Plaintiff's motion for summary judgment with respect to whether the Defendants: (1) breached the Employment Agreement by failing to pay the Plaintiff her salary from July 29, 2009 through November 15, 2009; and (2) breached the Consulting Agreement by failing to pay her the remaining $20,000 owed under the Consulting Agreement once the Employment Agreement became effective.

Although the Defendants dispute both of these issues in their response to the Plaintiff's Rule 56.1 Statement, they do not submit any argument or evidence in their opposition to the Plaintiff's motion. Rather, the entirety of the Defendants' opposition focuses on whether the Plaintiff's termination was for "good cause" and/or resulted from a "change in control".

## II. DISCUSSION

### A. Legal Standard on a Motion for Summary Judgment

It is well-settled that summary judgment under the provisions of Fed. R. Civ. P. 56(c) is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file,

6

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" within the meaning of Fed. R. Civ. P. 56 when its resolution "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam), and Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)). Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)). However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. Matsushita, 475 U.S. at 586, 106 S. Ct. 1348. Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223–24 (2d Cir. 1994) (citations omitted).

Furthermore, pursuant to Federal Rule of Civil Procedure 56(e), "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . .consider the fact undisputed for purposes of the motion [or] grant summary

judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e)(2) & (e)(3).

**B.  Summary Judgment Standard for Contract Disputes**

As set forth in the Employment Agreement, and undisputed by the parties, the Employment Agreement is governed by New York law.  Under New York law, "[a] written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." Brad H. v. City of New York, 17 N.Y.3d 180, 185, 928 N.Y.S.2d 221, 224, 951 N.E.2d 743, 746 (2011).  Summary judgment is appropriate in a contract interpretation dispute "when the language of the contract provision is wholly unambiguous" or "when the language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law."  Nycal Corp. v. Inoco PLC, 988 F. Supp. 296, 298–99 (S.D.N.Y. 1997) (citing Mellon Bank, N.A. v. United Bank Corp. of New York, 31 F.3d 113, 115–16 (2d Cir. 1994)).

"The existence of ambiguity is determined by examining the 'entire contract and consider[ing] the relation of the parties and the circumstances under which it was executed,' with the wording to be considered 'in the light of the obligation as a whole and the intention of the parties as manifested thereby'".  Goldman Sachs Group, Inc. v. Almah LLC, 85 A.D.3d 424, 426–27, 924 N.Y.S.2d 87, 90 (1st Dep't 2011) (quoting Kass v. Kass, 91 N.Y.2d 554, 566, 673 N.Y.S. 2d 350, 696, N.E.2d 174) (1998)) (alteration in original).  In this regard, however, the writing between the parties is the best evidence of what the parties agreed upon and a "unilateral expression of one party's postcontractual subjective understanding of the terms of the agreement . . . [is] not probative as an aid to the interpretation of the contract." Invista B.V. v. E.I. Du Pont

De Nemours & Co., No. 07-CV-713, 2008 WL 4865044 at *4 (S.D.N.Y. Nov. 5, 2008) (quoting Murray Walter, Inc. v. Sarkisian Bros., Inc., 183 A.D.2d 140, 146, 589 N.Y.S.2d 613, 616 (3d Dep't 1992)).

## C.  Whether and When the Employment Agreement Became Effective

The threshold dispute between the parties is whether, and when, the Employment Agreement became effective because, if the Employment Agreement never became effective, then there could be no breach of the Employment Agreement, and no obligation under the Consulting Agreement to pay the remainder owed "upon employment contract implementation".

Section 2.1.4 of the Employment Agreement provides:

> The Company and the Executive hereby acknowledge that the employment is contingent upon the Company's Funding of Working Capital.  The effective date is defined as the date which the Board of Directors has approved the terms and conditions of the Funding.

(Employment Agmt., § 2.1.4, pg. 2.)  According to the Plaintiff, the Employment Agreement became effective on July 29, 2009, when Echo's board approved the terms and conditions of funding by entering into a Series B Convertible Term Stock Purchase Agreement with Rock Island Capital, LLC, which provided Rock Island with 59.3% of the total shares of the company in exchange for payments to be made over the subsequent five months.  In support of this contention, the Plaintiff submits a copy of the July 29, 2009 Purchase Agreement, and cites to Section 3.3 of that agreement, which states in relevant part that:

> The Company has the corporate power and authority to execute and deliver this Agreement and the Transaction Documents and to consummate the transactions hereby and thereby contemplated.  The execution and delivery by the Company of this Agreement and the Transaction Documents and the consummation by the Company of the transactions hereby and thereby contemplated *have been authorized by all necessary corporate action of the Company*. . . . .

9

(Purchase Agmt., § 3.3, pg. 6 (emphasis added).) In addition, the Plaintiff submits excerpts from Echo's Form 10-K Annual Report dated March 30, 2011, describing the Purchase Agreement entered into between Echo and Rock Island on July 29, 2009, as well as subsequent amendments to the Purchase Agreement dated September 4, 2009 and March 4, 2010. (Murhpy Aff., Ex. 11.) According to the Plaintiff, these subsequent amendments "changed the timing of payment but not the substance of the transaction". (Pl.'s Br. at 12.) Finally, the Plaintiff notes that the Defendants have essentially admitted that the Employment Agreement was effective by: (1) relying on the provisions of the Employment Agreement in terminating the Plaintiff's employment and (2) focusing its opposition to the instant motion solely on the issue of whether they terminated the Plaintiff for good cause.

In their response to the Plaintiff's Rule 56.1 Statement, the Defendants contend that the Employment Agreement never became effective because: (1) the expected funding did not occur and therefore there was no "change of control" and (2) the Plaintiff could not fulfill her obligations under the agreement because she could not lawfully reside in the United States as she had previously represented. Although the Defendants submit evidence in this regard, neither of these contentions has any impact on whether the Employment Agreement became "effective" on July 29, 2009. Rather, the evidence submitted by the Defendants goes to the issue of whether the Plaintiff was terminated for good cause, and whether her termination was the result of a "change in control".

"While the court, in deciding the motion, must draw 'all reasonable factual inferences in the light most favorable' to the nonmoving party, see DeFabio v. E. Hampton Union Free Sch. Dist., 623 F.3d 71, 74 (2d Cir. 2010), a party opposing the motion for summary judgment must nevertheless support its argument by 'citing to particular parts of materials in the record,

10

including depositions, documents, . . . affidavits or declarations," see Fed.R.Civ.P. 56(c)(1)(A)." Hodge v. City of Long Beach, 433 F. App'x 17, 19 (2d Cir. 2011).

The Employment Agreement is unambiguous in that the only requirement for making the agreement effective is the "approval" of the requisite funding by the Board of Directors. The Plaintiff has submitted evidence that the Board of Directors approved the requisite funding by entering in to the Purchase Agreement with Rock Island on July 29, 2009. Not only do the Defendants fail to refute this evidence, but the Defendants' failure to address the Plaintiff's arguments in opposition to the motion for summary judgment constitute an admission of the relevant facts. Accordingly, there is no genuine issue of material fact that the Employment Agreement did in fact become effective, and that the effective date is July 29, 2009.

## D. Whether the Defendants Breached the Employment Agreement

The Plaintiff contends that, regardless of whether she was terminated for good cause and/or due to a change of control, the Defendants have breached the Employment Agreement by failing to pay her the portion of her salary earned between July 29, 2009, and November 15, 2009, the date of her termination. Thus, the Plaintiff seeks partial summary judgment on her cause of action for breach of the Employment Agreement.

Pursuant to Section 4.1.2 of the Employment Agreement, if the Defendants terminated the Plaintiff for good cause, she forfeited her right to "any further Base Salary". (Employment Agmt., § 4.1.2, pg. 11.) However, the Employment Agreement does not state that the Plaintiff forfeits her right to salary earned prior to the termination. Thus, the Court grants the Plaintiff's motion for summary judgment with respect to breach of the Employment Agreement to the extent it relates to compensation owed for work performed between July 29, 2009 and November 15, 2009.

With respect to damages, although the parties do not appear to dispute that the Plaintiff was not paid for her work during the relevant time period, the parties dispute the annual salary that the Plaintiff was entitled to under the Employment Agreement. The written portion of the contract states that her annual salary is $125,000, but the numerical representation, written in the same sentence, is $150,000. Furthermore, the Employment Agreement provides that, if the company "raises a total of $4,000,000 (net of fees) in one or more debt . . . .and or equity financing during the next 12 month period, Executive's pay shall increase to $150,000 and become effective upon the next pay period". (Employment Agmt., § 3.1, pg. 7.)

There is no question that the Employment Agreement is ambiguous with respect to the Plaintiff's annual base salary. As a result, the Court can look to parole evidence to resolve any ambiguity. The only evidence that the parties initially cited to as support for their respective positions was the Employment Agreement itself. However, in her reply submission, the Plaintiff cites to deposition testimony by Erica Zalbert, which was attached as an exhibit to the Defendants' summary judgment opposition. Zalbert was the Chief Financial Officer of SearchHelp who the parties agree was involved in drafting the Employment Agreement. At her deposition, Zalbert testified regarding the ambiguity in the Employment Agreement with respect to the Plaintiff's annual base salary. Zalbert stated that an earlier version of the Employment Agreement listed the Plaintiff's base salary as $125,000, and included a number of fringe benefits. However, because of the tax implications of the fringe benefits, Zalbert testified that the annual salary was modified "to a hundred and fifty with no fringe benefits". (Zalbert Dep. at 51–54.)

Although the Court finds this evidence compelling, the Court notes that, because the Plaintiff raised this argument in its reply submission, the Defendants did not have an opportunity

to respond. Accordingly, while the Court grants the Plaintiff's partial motion for summary judgment with respect to her entitlement to back wages from July 29, 2009 to November 15, 2009, the Court cannot conclusively determine the amount of damages at this juncture. Furthermore, although the Plaintiff claims she is entitled to pre-judgment interest, she does not present any argument or documentation with respect to the applicable pre-judgment interest rate. Thus, the Court finds that there are issues of fact precluding the Court from awarding damages at this stage.

**E. Whether the Defendants Breached the Consulting Agreement**

The Plaintiff alleges that the Defendants breached the Consulting Agreement by failing to pay the remaining $20,000 for the four months of work she completed under the Consulting Agreement, which was due "upon employment contract implementation". The parties do not appear to dispute that this provision refers to the implementation of the Employment Agreement. As previously stated, the Employment Agreement became effective on July 29, 2009.

The Defendants do not respond in their summary judgment opposition to the Plaintiff's contention that she is entitled to this money. However, in their response to her Rule 56.1 Statement, the Defendants state that the Plaintiff is "not entitled to payment under any agreement, as plaintiff could not fulfill the terms of any agreement, because, among other things, plaintiff could not lawfully reside in the United States on a permanent basis, but represented to the defendant that she could". (Defs.' 56.1 Stmt., ¶ 32.) As previously stated, the Plaintiff's ability to reside in the United States, while potentially relevant to whether she could fulfill her obligations under the Employment Agreement, is not relevant to whether the Employment Agreement is effective.

In addition, although there is a Schedule section in the Consulting Agreement that states that the Plaintiff will spend "two weeks in Munich and two weeks in New York", the agreement does not make the Plaintiff's compensation contingent on her performing a portion of the work from New York. Furthermore, even assuming such a condition could be read into the Consulting Agreement, there is no dispute that the Plaintiff was paid the initial $20,000 for performing the services required under the Consulting Agreement, regardless of her location when she performed them. Thus, the Defendants are estopped from asserting that the Plaintiff's payment under the Consulting Agreement was contingent on her immigration status or the location from where she performed her work.

Accordingly, the Plaintiff has met her burden on summary judgment of showing that the Defendants breached the Consulting Agreement by failing to pay her the additional $20,000 owed under the Consulting Agreement. However, although the Plaintiff asserts she is entitled to prejudgment interest, she does not provide any documentation or argument indicating the appropriate pre-judgment interest rate. Thus, the Court finds that there are issues of fact precluding the Court from awarding damages at this stage.

### III. CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED**, that the Plaintiff's motion for summary judgment that the Defendants' breached the Employment Agreement by terminating her employment without "good cause" and/or due to a "change in control" of the company is denied, without prejudice, and it is further

**ORDERED**, that the Plaintiff's motion for summary judgment on the grounds that the Defendants breached the Employment Agreement by failing to pay her salary owed between July 29, 2009 and November 15, 2009 is granted, and it is further

14

**ORDERED**, that the Plaintiff's motion for summary judgment on the ground that the Defendants' breached the Consulting Agreement by failing to pay the Plaintiff the $20,000 owed under the Consulting Agreement is granted, and it is further

**ORDERED**, that the parties are directed to appear before the Court on September 11, 2012, at 9:00am to set a date for trial.

**SO ORDERED.**
Dated: Central Islip, New York
August 6, 2012

_/s/ Arthur D. Spatt_
ARTHUR D. SPATT
United States District Judge